This is an appeal of a trademark infringement lawsuit that resulted in a judgment in favor of Streamline Production Systems for $690,000, and on appeal, SMI challenges both liability findings and damage findings. I'd like to start with the initial issue of the protectability of the mark. The Court should reverse the liability finding because Streamline Production Systems, the mark at issue, is descriptive, and SPSI failed to establish secondary meaning. As this Court knows, the fundamental difference between a suggestive mark and a descriptive mark is that a suggestive mark is inherently distinctive, and the party suing for infringement does not have to establish a secondary meaning. A descriptive mark, on the other hand, is not inherently distinctive. The defining characteristic of a descriptive mark is that it describes some sort of a characteristic, a quality, a function, a purpose, something about the product at issue. That's the most important aspect of a descriptive mark. Now, in categorizing the marks, courts look to the overall context in which the mark is used. You don't just look at the name itself. You look at how the party is trying to enforce the mark, uses the mark, and you do so in connection with the intended market or their Streamline Production Systems, the mark at issue, is used by SPSI in all of their web material, brochures, et cetera, as branded over images or pictures of highly sophisticated natural gas processing equipment. There is no question that Streamline is a word that is used to describe a characteristic or function of these products, namely that they are efficient. That's what Streamline means. The testimony at trial was that Streamline, which notably is the only word that is in common with my client's name, Streamline Manufacturing, Streamline means efficient, and that's the record site at 2270. That's the testimony, the only testimony, as to what Streamline means. And, of course, it comports with the natural gas processing equipment. It describes the function of their product, undeniably. And, moreover, the testimony in the record as to who are the consumers of these products shows, without question, that they are highly sophisticated natural gas plant operators. And these pieces of equipment are... What does it actually do? The natural gas equipment that they process, my understanding is that as they're drilling for natural gas, it helps to bring the gas out of the ground, and it processes it, and it makes the gas flow into the system that's out there at the site. And these are pieces of equipment that are highly sophisticated, they're very expensive, and they take sometimes months to manufacture. So, clearly, the consumer here is... Why wouldn't the gas flow without that? I mean, I'm very ignorant about this. And I don't know that that was fully developed at trial, to be honest, on that. But what's clear is that the equipment is to process natural gas. So the idea of Streamline used over that, it could be nothing else but to describe some sense of efficiency, which is what the testimony was. Are you talking about process it or get it out of the ground? You know, I don't know that the testimony was entirely clear on that. Well, that would be quite different, wouldn't it? Well, I don't think so. The product itself, these equipment is clearly used in connection with the natural gas refining process, whether it's out of the ground or otherwise. Refining. I believe so. You said refining, not production out of the ground. Your Honor, I'm not sure that the record is entirely clear. And it may be that these pieces of equipment vary and can be used in both capacities. But what's clear is that it is used in connection with the natural gas. So the word Streamline, which means efficient, it clearly describes an aspect of the product. And therefore, and especially in conjunction with the type of sophisticated consumer that we're dealing with here. So the determination or the conclusion that Streamline is descriptive and not suggestive is not only born out in the record, it's born out through case law and other decisive authority that we've cited in our brief that goes back as far as 1937, where it was initially, I'm sorry, the Patent and Trademark Office initially looked at the word Streamline and it squarely addressed the issue of whether this word Streamline is suggestive or descriptive. They held not surprisingly that it is descriptive. We've cited many other decisions that looked at either Streamline or something very comparable, such as easy flow, slim line, slow flow, high flow, simplified. All of these are similar types of words. And all of these cases that we've cited in our brief say these are the type of descriptive terms that are descriptive as far as the categorization of the mark and not suggestive. Here, the Streamline production system's mark is therefore descriptive, and it was their burden to show in order to advance their infringement action, it was their burden to show that their mark has acquired secondary meaning. That's where this court's decision in the Testmaster's case comes in and is so important. In that case, this court described that a secondary meaning arises when the mark has, in the mind of the public, come to stand for a name or identification for that product or firm. But as this court described, in order to prove secondary meaning, it's the burden of the plaintiff to offer evidence, some sort of empirical inquiry, and to show that a significant quantity of the consuming public understands the mark to be associated with their name. Survey evidence, things like that. All of that was described in the Testmaster's case. Here, there is zero evidence, empirical evidence, survey evidence, evidence from consumers in the field that would somehow support the notion that the consumers of these products understand or associate the word Streamline as being associated with their firm. The record is devoid of any evidence of secondary meaning. So we submit that as an initial matter, that this court should reverse and render judgment in favor of SMI because they failed to establish secondary meaning, and these marks are descriptive. I'd like to switch gears now and talk about the actual liability finding on the infringement, which is a separate issue that we've also addressed. It is SPSI's burden to prove some sort of a reproduction, counterfeit copy, or a colorable imitation of their trademark. And in addition, they must establish that the use of the mark or the alleged infringement was likely to cause confusion, and I'd like to address those two issues before I address the damages. With respect to the likelihood of confusion, no, I'm sorry. With respect to the colorable imitation, it's important for this court to remember that the mark that they're trying to protect is not the word Streamline. They don't own Streamline. What their mark is is Streamline Production Systems. So it is their obligation to show that we have used a colorable imitation of that mark. There's no evidence of that. SMI has never used Streamline Production Systems. They've never gone by the word Streamline Product or Streamline Products or anything that could be fairly characterized as a colorable imitation of their mark. SMI goes by the name SMI, or as they've pointed out, occasionally they would answer the phone Streamline. But there's no evidence that we've ever used anything that is close to Streamline Production Systems, Inc., which is their mark. With respect to the likelihood of confusion, there are many aspects and many elements of that, and we've addressed all of those in the brief. But as this court has pointed out and other courts have as well, the most important element is the element of actual confusion. And here the jury was instructed that there must be a significant number of reasonable people that are likely to be confused or deceived by the mark. SPSI has conceded in their brief at page 23 that the relevant inquiry is whether there is confusion in the minds of potential customers. Here SPI's own witnesses, Renick, Bainbridge, and their damages expert, Leathers, all conceded that there is no evidence that my client, SMI, has derived a single, solitary sale from some customer who intended to do business with their company but confused our company for theirs. There's no evidence, which explains precisely why the jury awarded zero damages when it comes down to profitability. I want to, in my remaining time, before I reserve five minutes for rebuttal, I want to address the damage aspect. As I just mentioned, zero award for lost profits. That's extremely telling here. So how do we get to a $690,000 judgment? The theory that they advanced first was this idea of a royalty. The problem with the theory is that even though some courts have recognized a royalty recovery in a Lanham Act or trademark infringement case, those cases, almost all of them, deal with situations where you have two companies that had negotiated the potential use of a license where the plaintiff, part of their income stream, part of what they do is they license their product out for other people to use, and where the defendant may have entered into negotiations but those negotiations shut down, but they used the mark anyway. That's the situation where royalties have been allowed. Here there's no evidence of that, and certainly, backing up a little bit, there's no evidence that we ever used streamlined production systems. So certainly we never would have entered into a license to use streamlined production systems. That's not our name. We're streamlined manufacturing. So they want to try to substitute the lack of proof here for a hypothetical negotiation. We've cited several cases, including cases from the Fifth Circuit, that indicate that any sort of royalty has to be based on a prior negotiation, and that's most tellingly the Boston Professional Hockey Association case. But moreover, even in cases where you've had prior negotiations, which don't exist here, they have to establish, in order to be entitled to a royalty award, they have to show, blink, the amount of the award to some correlation of the rights that we allegedly appropriated. Now, in other words, that we would have benefited something by paying them a royalty amount of money, that we would have gotten something for that. Here's where Leather's testimony is so important. He says that what we got was the ability to charge premium prices. Well, there's no evidence that we ever charged a premium price because we named them ourselves streamlined manufacturing. No evidence. They say that we gained the ability to better compete against startup companies. What startup companies? And how did we gain an ability to better compete? The evidence in the record is Mr. Morales, the entire customer base of SMI, is derived from Mr. Morales's prior business relationships, not any capitalization on a name or anything other than his prior relationships. That's it. That's why they didn't advertise. They didn't need to. It's all a preexisting client base that they've continuously served. So their royalty theory doesn't work, and we would ask the court to vacate that award and specifically reject the idea that it can be based on some sort of a hypothetical negotiation where there's no evidence that the parties have ever entertained the idea or notion of bargaining for the right to use what they say is their protected mark. Did they show anything by way of what other companies in the business do in terms of royalties? No, and that's they did not. They based it on this hypothetical negotiation, and they tried to justify the 3 to 5 percent figure with the supposed benefits that I just went through, such as the ability to compete against startups when there's no evidence of that. But Judge King, no. There's no evidence that here's another manufacturer of natural gas processing equipment who part of their business is to license out their name, and here's what other companies in that business would charge for the use of that name. There's no evidence of that. Would it have to be in the same business? I think so. I think so. For a royalty award, show that, the one with the sports drink. It shows that it has to be in the same line of business, and there's no evidence here. Quickly, the unjust enrichment I want to address, because what's telling here, even though there's zero damages in terms of profits derived because we have our own customer base and we've never capitalized off their customers, the jury awarded the identical royalty figure, 230,000, for an unjust enrichment award. And here, our point is that there's no evidence of unjust enrichment, but I also want to direct the court to the record at 2426 and the record at 2724, because those two excerpts explain why the jury, nevertheless, awarded the identical figure for an unjust enrichment. Their expert witness testified it's an unjust enrichment that they were able to use the trademark for free, basically. It's the royalty calculation. So they duplicated it, and they convinced the jury to do that. That's a double recovery. Counsel, in their closing argument, said the same thing. The quote there was, during the closing argument, SPI's counsel described unjust enrichment by commenting, again, this is the quote, again, that's the royalty. So award that figure as the royalty. It's plainly a double recovery. I see that my time is up, and I'll address the remaining damage element of my rebuttal. All right. Thank you, sir. Mr. Joseph. Thank you, Your Honor, and may it please the court. The gravamen of any trademark infringement case is the likelihood of confusion, and this court has set forth a list, a non-exhaustive list of digits of confusion that I'm going to go through first, and then we'll talk about damages, which, frankly, I think is the real sticky part of this appeal. The first digit, to answer your question, Judge Kink, we're not a production company. If we were a production company, then streamlined production systems might be descriptive, but we're actually not in that business, and I'm going to get to that in just a moment. The first digit is the strength of the mark. Now, you've heard a lot of argument here that the mark is merely descriptive, and we fail to put on any evidence of secondary meaning. This court set forth a test to determine whether or not a mark is merely descriptive or not in the Zatarain v. Oak Grove case, 698 F. 2nd. 786. In that case, Zatarain had a four-part test that was applied in Blenko v. ConAgra Foods, which is 132 Federal Appendix 520. In Blenko, they had a product called Better in Butter, Better hyphen in Butter, Better in Butter. It's an oil-based butter substitute. ConAgra came up with Better in Butter, but it was Better hyphen in Butter. And so the lawsuit was filed, and the court applied the Zatarain test, and the first test is the dictionary test. And the court found in Blenko that Better in Butter is not a standard dictionary term so that that particular test doesn't apply. I would suggest that streamlined production systems is not a standard dictionary term, although you can find the definition of streamlined. You can find the definition of production and system, but none of those definitions say natural gas processing and oil field services. So the dictionary test, I would suggest, falls in favor of finding not descriptive. The second test is the imagination test, and that is if the mark requires imagination, thought, or perception to conclude the nature of the goods. Now, in Zatarain's, they were trying to get a trademark on fish fry, and that was found to be not protectable because you don't have to use any imagination when you see fish fry to understand what it is. But the court found that Better in Butter, you did have to use imagination because you don't automatically think oil-based butter substitute when you hear that. I would suggest that when you hear streamlined production systems, you don't think pressure vessels, heat exchangers, degassers, gas separators. You don't think about that. So you have to use imagination to understand what the mark means and who it is. The third test is the likelihood that a competitor would need the term and its mark to describe their product. Obviously, everybody who sells fish fry is going to have fried fish with this on their product. You need that on there to tell people what it is. Well, the court in Blenko said that you did not need, the competitor did not need to have Better in Butter on its product to describe what its product is. Now, since we don't sell a streamline, we don't sell a production, you don't need streamline in your name to describe what your goods or services are in our case. So that shows that it's not really descriptive. You don't need that name. You don't need streamline in your name. And the fourth test is the extent others have used the name marketing their product. Well, lots of people had fish fry on their products, marketing their fish fries. That's why fish fry was not protectable. There's just Blenko and ConAgra that had Better in Butter on their products. So there was a very small extent, almost no extent, that any other companies were using Better in Butter. And it's the same situation here. There aren't a lot of, there was no evidence of any other companies in the natural gas processing equipment business with streamline in their name. It's just us two. So all four of this court's tests in Zatarain as applied in Blenko fall in favor of finding a streamlined production system is not merely descriptive. The second digit is the similarity of the marks. This court found in Marathon Manufacturing v. Interlite that the more closely related the products are, the less similar the marks need to be to find infringement. The marks in Marathon were very different. In fact, Marathon had the corporate logo of the phoenix rising from the ashes and the word Marathon, and the infringer just had Marathon 10. They were nickel cadmium batteries. But nonetheless, the court found that there was infringement and likelihood of confusion even though the marks were not identical. In our case, they're blue and white, streamline manufacturing, streamline production. It's on their nameplate on their equipment out in the field. It's on their websites. So I would suggest to you that that digit also falls in favor of finding that the mark is at least suggestive. The third digit is similarity of products. Well, there's no dispute that we sell the same products. The fourth is advertising. The appellant testified, they testified that they really didn't do much advertising. I'm going to suggest this particular digit is neutral because streamlined production system does do a lot of advertising. On notepads they hand out and calendars and pens. They advertise on a race car. They have brochures. So they advertise a lot. Streamline manufacturing claims they didn't. And here's probably the most important digit, actual confusion. We don't have to show actual confusion to prove a likelihood of confusion. But there were instances after instances that showed that. The first one was Pioneer in West Texas. Pioneer called us and wanted to buy some more pressure vessels from us. Well, we never sold Pioneer a pressure vessel. They saw that there's a nameplate that goes on the pressure vessel out at the refinery. And it says streamline on it. And so whoever was going to purchase the next pressure vessel saw the streamline and streamlined out in Coombs, Texas and called us. That is actual confusion from a customer. That was in 2012. Vendors were confused. We had on more than one occasion vendors who we ordered equipment from ship it to our, quote, unquote, Houston office. When we called them and said, Where's our stuff? It was supposed to be here Tuesday or Wednesday. They would say, Well, we shipped it Monday to your Houston office. We don't have a Houston office. That's where the infringer's office. We were denied credit in Corpus Christi by a vendor because they said we were way behind on our bill. And when we finally got to the bottom of it, it was the infringers that were behind on their bill. And that's why credit wouldn't be extended to us. And we got it worked out. And if you read the brief, every one of these instances the appellants want to argue, Well, they're isolated. They're not any big deal. But these are actual, this is actual confusion. We've got vendors. We've got customers. We've got the Secretary of State of Texas contacted the defendant saying, You need to pay your franchise taxes. And it was really us. The Secretary of State was confused about who Streamline was. New Century Exploration is a good example. And this is at 2051. And I have sites for the rest of those, too. But this is at 2051 of the record. We sent a tech out to do some work at their plant. And he saw a Streamline plate on a pressure vessel. And so he goes to his contact, Chris Evans, and says, Why don't you let us bid on your processing equipment? And Chris says, We're already buying from you, from your Houston office. There's an example of an end user who bought a pressure vessel thinking it was from us. Are the websites similar, or were they? They are. The websites were similar? Yes, sir. But this was a plate on a pressure vessel. No, no, no, no. I understood the point you were making. I was asking an additional question. When you were talking about not having to prove actual confusion, but you had proof of it, when you described that, and I was just asking additionally whether the websites existing at the time were similar or otherwise confusing or may have led those persons who were confused saying, I went to the website, saw a Houston address, and that's why I shifted that. That's all. The websites weren't similar. They were blue and white with blue lettering, and it has a picture of the natural gas processing equipment on it and streamlined manufacturing, streamlined production systems. There was an authorized vessel inspector that went to the defendants and said, You know, there's another company over there that has your name. It's got streamline in it, right? So you have to have your vessels inspected. Different vessels have different capacities, different thicknesses. If it's 3,000 pounds, it's three or four inches thick. If it's 100 pounds, it's a quarter inch thick. So here's a guy in the industry that goes around everywhere inspecting people's equipment and says, You've got somebody else with your name. And then finally, Union Gas was a customer of ours that we did work for. They sent their payment to the defendants. Now, it wasn't an astronomical amount of money, and they sent us a check, and it got cleared up. But that's a customer of ours that we did work for sending a payment. That's how confused they were. Now, that was in 2013, so this is going on for more than a year. As I'm going through all this and I finish up all these instances of actual confusion, I ask the defendant on the stand, Don't we have a right to protect our name? And I'm talking about that right. And what did you do when you heard all this? What steps did you take? And the defendant was kind of hem-hawing around, and then Judge Hittner leaned over and he said, Did it worry you at all? And he said, No. That's very important for intent. Right after that, I start talking to the defendant about how they set their business up, and it was a competing business with a former employer. And I said, And you got all your customers by poaching your former employer. He said, What does that mean? I said, Stealing. He said, Yes. So now the jury has heard of all these instances of actual confusion where they did nothing to try to remedy it, took no steps to alleviate the confusion, and how they set up their business and that stealing and dishonesty was their business model. It's very, very important to note when you're talking about confusion of customers that the defendants sold in large part to resellers, distributors, not to the end user. That's at page 2253. Streamlined production systems sells to the end user. So it's very, very difficult in this case to figure out who ended up with a heat exchanger or a gas separator or a reheater thinking they got it from streamlined production systems when they bought it from a distributor who may or may not have known who they're buying from. But certainly in order for streamlined production systems to show we lost this sale to this customer because they were confused, it's a diverted sale, we would have to depose or find out from every one of our customers the products they bought and if they were confused and every one of the end users sold to by the distributors that the defendants sold to and depose all the distributors and depose all of the companies they sold to. That's not reasonable. That's probably not even doable. And I say all that, let me finish up the intent. I say all that to point out as we're going to get to the damages here in a minute, this actual confusion and the poaching and the fact that they sell to resellers and middlemen creates an onerous burden that I want to finish these digits real quick to talk about. Intent is the last intent, the next digit, sorry. In the face of all the testimony of actual confusion, the defendants testified they never gave any thought to our rights to protect our name, didn't think about it. When they got actual notice, they did nothing about it. This court said in the Elvis Presley case that even if you start out as a good faith infringer, you didn't know there was another mark that you adopted, once you find out about actual confusion, you have to take reasonable steps to alleviate it or you do become actively infringing. That shows your intent. If you know about it and you don't do anything to alleviate the confusion. They took no steps to alleviate it. They intentionally and willfully were blind to it, and the jury found that. There was a cease and desist letter sent to the defendants by a firm prior to my firm, saying you're using our mark, we've had our mark this long, you have to cease, you have to stop. They sent a letter back just like the Blanco case and said, well, no, we think your mark's really descriptive and we're not going to stop. We had to file a lawsuit to make them stop. This is the first lawsuit the owner of Streamline Productions has ever filed in his life, and he was willing to just let it go if they would just stop and change their name, but they refused. He sent a letter. They refused. We filed a lawsuit. We entered into a stipulated injunction where they agreed to change their name, and they still don't change their name. They had a deadline. They let it pass because they didn't want to waste invoices and what have you. They didn't even comply with the injunction they agreed to. This all goes to their intent. Retail outlets and purchasers, we don't sell retail, and we just talked about the purchasers. They sell to resellers. We sell to end users. So it's just a monumental task to figure out the person that ended up with this component, if they were confused or not, with all these layers in between with the reseller. In the Blanco case, it was not hard. Go ahead and shift to damages so you don't run out of time since a lot of the open argument was on the damages. This is a good segue. In the Blanco case, they took the customer list of Blanco, the customer list of ConAgra, all the overlap. The judge said, the court said, for each and every customer that Blanco ever sold to, irrespective of actual confusion, you're going to get your lost profits. Blanco said, I should get it on all their sales. The court said, ConAgra is nationwide. You're in seven states. That's a windfall. So no. It is true, and I hope that this case settles once and for all the issue of whether or not, in the Fifth Circuit, a plaintiff in a trademark infringement case can get a royalty based on a hypothetical negotiation. Or, if the rule is, royalty damages are not available to trademark infringement cases where there is not a written license agreement that's expired or an offered license agreement that was denied or rejected, if that's the rule, say it. Royalty damages not available unless a written agreement exists that reflects a previous party's agreement. If that's the rule, say it. Because as I read the cases, particularly the Brennan v. Dickey-Brennan case, I mean, the court says hypothetical royalties may be awarded in trademark cases, especially if there's a licensing agreement. 15 U.S.C. 1117 says the court has broad discretion, and this court found in Blenko, the court has unusually broad discretion to fashion a remedy in a trademark infringement case. If that's the case, if the court has broad discretion subject to the principles of equity, why is the court hamstringed when damages in a particular case are difficult, if not impossible, if lost profits are not difficult, if not impossible, to prove? Royalties based on hypothetical negotiations are allowed in patent infringement cases. They're allowed in copyright cases. To not allow that in a trademark case seems to me to be, A, against the equities because this little company, for example, couldn't afford to depose all those people. Nobody could but Exxon or BP. And even Exxon or BP doesn't want to get their customers, every single customer they have, involved in their litigation. That's not reasonable. That's not equitable. In this case, it was we could not prove we lost a sale. That's true. But that also happens in patent cases and copyright cases. And to say it's not allowed in trademark cases seems to me to be, frankly, arbitrary. There are other circuits that allow a recovery of royalties based on a hypothetical negotiation. The Seventh Circuit, the Third Circuit. I've got 30 seconds. The award of damages is an abuse of discretion standard. Under 151117, the court can award the defendant's profits, the plaintiff's lost profits, and costs. Well, the profits were $21 million. That's what the court heard. The court also heard that a reasonable royalty is 3% to 5%. The court could have awarded $21 million. But we couldn't prove a nickel of damage, direct damage, and so that would have been a windfall. The court didn't do that. Instead, the court, if you took a 3% of $21 million, that's $630,000. I'm out of time. In one sentence, what do you say about his unjust enrichment argument? The number is the same because basically that number is almost impossible to calculate. But what it's for, the reasonable royalties for past infringement, the unjust enrichment, is for what's going forward. They got an accelerated market entry. Their equipment is going to be out in the field now for the next 20 years with their nameplate. They're getting that out there. That goes on for the next 20 years. That infringement goes on for 20 years. That's what the unjust enrichment is for. How do we know that? Other than you saying it, I mean, he seems to make, at least to me, a persuasive argument about the unjust enrichment. Sometimes that sort of comes into play in a nebulous arena where you can't figure anything else out or where something else isn't defined, et cetera, et cetera. Whereas there's an attempt to assess, quote, actual damages, royalties, et cetera. The argument is fair. The unjust enrichment is sort of an added thumb on the scale. It's nebulous. Whether it's good measure and so forth. I guess within the question is what is it anchored to here in terms of evidence or cases that have allowed unjust enrichment in the context of the way you presented the damage? I know you've just stated a reason, but other than your saying it, what would be the basis for us finding that that was a legitimate, well, I shouldn't put it that way, but an award that fits within what the jury found? When you put it in context of the reasonable royalty and all the question about whether that's even allowable or not, the court has discretion to fashion a remedy. And the court found that that number was an accurate number for their accelerated market entry and the fact that their infringement is ongoing. And I don't think that you can say the court abused its discretion in determining that the unjust enrichment is sort of ongoing. But on the one hand, you say you can see that you cannot show that you lost actual sales as a result of what they did. But on the other hand, there's an award for unjust enrichment. There's a little bit of tension there is all I'm throwing out there. And I don't dispute it. I'm not saying I would come out, but I'm just saying you stated, you know, concede as you should. We cannot establish lost sales, et cetera. You've thrown the other things, but didn't have the unjust enrichment. That sort of was the pressure there. But, I mean, I've got your answer. I know he's coming back on. But I wanted to at least get you on the books for what you're saying about that. Well, it's been my privilege to appear. All right. Thank you, sir. We appreciate it. All right. We're back to you, Mr. Knight. Thank you, Judge. I wanted to address several points in response. First, the idea of the descriptive mark. What he said is that it's a suggestive mark. It's not descriptive because when you look at the definition of streamline, it doesn't say natural gas processing. That's not the test. A descriptive mark describes a function. Here, streamline means efficient. It's describing their equipment. It is a descriptive mark. Next, Your Honor, Judge Stewart, you asked about the website. And I want to address that because I think that this is so important in this appeal. The timeline of the website I set forth in my brief. In 2001, which is admittedly before my company came into existence, 2001, they got the rights to use StreamlineTX.com. In their pleadings, they say that they used it for about six or seven years. They forfeited that website by 2006, 2007 timeframe. They forfeited it. Now, by 2009 or 2010, my guys, they're not even really interested in getting a website. They've got a preexisting customer base, but their customer said, look, you probably need to get a website. That would be helpful to us. So they go on godaddy.com and they look for a name. And it, of course, is available, StreamlineTX.com. Nobody else has it. Now, when they had that website for those six or seven years before we legally acquired the web domain, the testimony in the record is that what their website looked like was a generic picture of an oil derrick. That's it. And they said they didn't even generate sales from it. We get the trademark or the domain name in the 2009, 2010 timeframe, and they develop a nice website that describes their products and services and what they do. In 2011, these guys, SPSI, they find out about that, and they're mad about it, apparently. 2011, they then search for and get the rights to StreamlineTEX.com, a website now that looks strikingly similar to the website that we have legally acquired. They changed the look and appearance of that website to now make it look like our website. Your Honor asked about were the websites similar. They were similar, that's the testimony, by their doing. Now, they knew of our company by 2011. They don't send a letter until 2014. Most of the argument that I heard was, well, there was all this confusion going on, and you, SMI, should have researched and done something about this and contacted us and addressed the problem. They knew about our company by 2011 when this whole issue with the website came up, and they kept quiet. They not only kept quiet, they developed their own similar website. They then registered, Mr. Rennick registered the mark for the first time in his own name, not in the company's name. By the time that cease and desist letter was sent, SPSI didn't even register the mark. Mr. Rennick transferred the mark to facilitate this lawsuit that they wanted to file. All of that is set forth in our brief. The whole idea of intent here, the question for the court is, when we came up with our name, Streamline Manufacturing, did we do it with some sort of intent to take something from them? The only evidence in the record on this point is that my clients had no clue that there's a company 100 miles away that serves an entirely different customer base that calls themselves Streamline Production. No clue. In fact, the testimony is that they properly retained a lawyer who did a search on the Secretary of State website for a name, and they found this name that was available, open, and not in use, Streamline Manufacturing. The intent element has to go to when we set up the name, the name of the company. There is zero evidence of intent. On this issue of intent, I think the court has to question and should certainly wonder, why is it did they keep quiet for so many years, alter the website to make it look like ours? Now, on this issue of confusion that they talk about, the court will note that the only two examples that they cited that actually involve consumers of the products is Century and Pioneer. Both of those examples involve situations where a company is out there and sees a product that SMI manufactured and called them. They benefited from what they say is the alleged confusion. They can't find, of all their 300-plus customers on their list, they can't find anybody, and nobody testified, that anybody that they serve confused them for us and reached out to us. It's nonexistent in this record. He talked about, Your Honor. I've got a red light. I'll let you finish your sentence. My last point was on the royalty issue. One of the points he made is, look, it's available in patent cases and so forth that ought to be available in the Lanham Act. It's available in the patent cases by statute. Statute allows it. Not here. All right. Thank you, gentlemen, from both sides. Appreciate your argument.